IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| JANICE THOMPSON,<br><br>                    Plaintiff,<br><br><br>vs.<br><br><br>ADMINISTRATIVE OFFICE OF THE<br>COURTS and DANIEL BECKER,<br><br>                    Defendants. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:04-CV-461TC |

Plaintiff Janice Thompson was terminated from her position with the Administrative Office of the Courts (AOC) for the State of Utah.  Before her termination, Ms. Thompson had been speaking with staff members of the legislative auditor's office, which was beginning an investigation of the AOC.  Ms. Thompson claims her termination was in retaliation for her cooperation with the legislative audit.

Ms. Thompson filed this suit seeking relief under 42 U.S.C. § 1983.  She alleges her termination and actions by the AOC and its director after her termination violated her First Amendment right to free speech, her Fourteenth Amendment liberty interest, and Fourteenth Amendment property interest.  Because no reasonable jury could conclude that Ms. Thompson's termination was in retaliation for her protected speech, because Ms. Thompson waived her right to a name clearing hearing, and because Ms. Thompson had no cognizable property interest, the Defendants' motion for summary judgment is GRANTED.

**BACKGROUND**

Ms. Thompson was employed  by the AOC from February 6, 1995 to March 14, 2003.

Her duties included working with media, publicizing and educating the public on the judiciary,

and other public relations work.

July Performance Evaluation

On July 18, 2002, Ms. Thompson received her annual performance evaluation from her

direct supervisor, AOC executive Dan Becker.  The performance evaluation was mixed.  Ms.

Thompson generally received high marks for her work with judges.  But the evaluation

highlighted problems in a number of other areas.  First, Ms. Thompson had difficulties working

with others and utilizing interpersonal skills.  In particular, the evaluation raised the concern that

Ms. Thompson's coworkers believed she was spreading rumors in the office.   In several places it

was noted that Ms. Thompson did not effectively prioritize her duties, resulting in projects that

had to be finished by other staff members at the last minute.  As a result, the evaluation stated

"more direction, prioritization , and job definition is needed."  (Def. Mem. Supp. Summ. J., Ex. 4

at 2) Other issues discussed in the evaluation included properly accounting for time, letting

others know her location during the workday, properly following accounting and purchasing

practices, and keeping state equipment at home.  The evaluation gave Ms. Thompson specific

objectives.  These included, "improve organization of all work, not just media response,"

"improving relationship[s] and trust level[s] with co-workers," "display a supportive team

attitude with fellow staff, judges, and court personnel," and hold "regular meeting to assess

progress and program activities." (Id. at 4-5)

Ms. Thompson had been unhappy with the management of the AOC, and particularly Mr.

Becker, for some time.  She had talked with other staff members and the judges she worked with about her dissatisfaction.  Her attitude toward Mr. Becker was described as "hostile" by Chief Justice Christine Durham.  (Defs.' Mem. Supp. Summ. J., Ex. 10)

The Legislative Audit

In June of 2002, the auditor of the legislative branch of the Utah was asked to complete an audit of the AOC.  In October of 2002, Ms. Thompson met with the legislative auditor to deliver staff directories.  Subsequently, the legislative auditor asked her to meet with him to discuss some organizational issues.  During that meeting Ms. Thompson told the auditor that she had serious concerns about the way Mr. Becker managed the office and state funds.  Specifically, she told the auditor that employees were removed from regular full-time positions to positions funded by grants so that they would not be counted as regular employees; money earmarked by the legislature for child welfare mediation was used elsewhere; the AOC employed irregular hiring practices; unnecessary and expensive conferences and travel were scheduled; funds were spent on training clerks rather than hiring additional clerks, as requested by judges; AOC management had not developed a layoff plan "in the face of pressure to reduce cost from the legislature;" and the AOC staff was expanding, while judges were losing law clerks to layoffs. (Thompson Aff. ¶ 19)  On October 23, 2002, at the recommendation of the legislative auditor, Ms. Thompson registered under the Utah Protection of Public Employees Act (the Whistleblower Act).[1]

---

[1]Ms. Thompson testified that the legislative auditor called her and reported that Mr. Becker had called him and accused Ms. Thompson of being an informant.  But this report of Mr. Becker's statement to the legislative auditor is inadmissible hearsay.  Mr. Becker testified that he called the legislative auditor.  But he stated that he only asked to be notified if there were any

On October 30, 2002, Ms. Thompson raised the same complaints she had made to the legislative auditors about Mr. Becker in a meeting with Chief Justice Christine Durham.  Chief Justice Durham asked Ms. Thompson if she had given information to the legislative auditors and Ms. Thompson said that she had and explained what she had told them.  The Chief Justice then invited Mr. Becker and Mr. Becker's deputy, Myron March, who had arrived for a previously scheduled management meeting, into the room.[2]  Chief Justice Durham reported what Ms. Thompson had told her.  Ms. Thompson testified that she was reprimanded for providing information to the legislative auditors and instructed to cease communicating with the legislative auditor, except through Mr. Becker.[3]

Ms. Thompson continued to communicate with the legislative auditors through November.  As of November 12, 2002, five other AOC employees registered as whistle blowers in connection with the legislative audit.

November Reorganization

On November 19, 2002, Mr. Becker wrote Ms. Thompson a letter focusing on the

---

concerns that employees raised to the legislative auditor that Mr. Becker should be addressing. He testified that he did not mention Ms. Thompson by name.

[2]The events that occurred during this meeting after Mr. Becker and Mr. March arrived are disputed.  For purposes of summary judgment, the court accepts Ms. Thompson's version, which is described here.

[3]Ms. Thompson's affidavit makes it impossible to determine who gave her the reprimand and the instructions.  Her affidavit reads: "[Chief Justice] Durham then invited Becker and March to join our meeting.  They confronted me about my whistle blowing activities in providing the auditor with information.  I was reprimanded for providing information to the Legislative Auditors and instructed to cease my communications with the Legislative Auditors."  (Thompson Aff. ¶ 25, Oct. 3, 2008)  From this phrasing, it is not clear whether Chief Justice Durham participated in the encounter or merely observed it.

4

problems cited in the July performance evaluation.  In the letter, Mr. Becker expressed

dissatisfaction with Ms. Thompson's progress in correcting these problems.  He noted that Ms.

Thompson had made no progress in accounting for her time.  For example, she was not

completing time sheets or informing others of her location during the workday.  In addition,

"[u]nsolicited complaints by fellow employees about the spreading of rumors continue to be

brought to multiple managers, and recently the Chief Justice.  The problem of such activities

leading to a general lack of trust among co-workers has not improved."  (Defs.' Mem. Supp.

Summ. J., Ex. 7) As a result of this and a AOC-wide reorganization, Mr. Becker informed Ms.

Thompson that she would be moved from his direct supervision and begin reporting to Kim

Allard.  But her compensation and benefits would remain the same.

 Ms. Thompson characterizes this event as a demotion.  She maintains that this is evident

from the curtailing of her duties, the loss of her administrative assistant, her new supervision by

Ms. Allard, and a change in her title from "Communications Director" to media relations officer.[4]

 The AOC explains these changes primarily as part of the broader restructuring in the

department and also as a response to problems identified in the letter.  As explained both in the

November 19 letter to Ms. Thompson and a November 20 memo to the entire AOC staff, the

departure of an administrator, Holly Bullen, who was not being replaced, had caused a

reorganization of the office.  Ms. Bullen would not be replaced at the administrator level, rather

the AOC would create a new position of public information officer with responsibility for

---

[4]The AOC maintains Ms. Thompson was never given the title of "Communications Director," but began using the title on her own initiative.  The evidence in the record concerning Ms. Thompson's job title is unclear.  But, for the purposes of summary judgment the court must accept Ms. Thompson's claim that her title was changed.

internal and external communications work and responding to requests for information.  Ms. Thompson had previously performed these duties.  In the November 19 letter, Mr. Becker stated that the change in duties was in response to Ms. Thompson's complaints about her workload.  He pointed out that Ms. Thompson had expressed dissatisfaction with working for him; Mr. Becker stated that the transfer was in part to address this issue.  The November 20 memo to all AOC staff states that Ms. Thompson's assistant, Carolyn Carpenter, would be assigned to work half-time in Ms. Allard's division assisting in the area of public information, communications, and media relations.  Ms. Carpenter would also work half-time for the legal department.  Before the reorganization, Ms. Carpenter had worked half-time for the communications department and half-time for Ms. Bullen.

The November 20 memo outlined the department changes.  The stated objectives for the reorganization included "organize for efficiencies to account for the loss of positions over the past year," "distribute Holly Bullen's responsibilities along functional lines," and "organize like and complimentary activities into divisions."  (Defs.' Mem. Supp. Summ. J., Ex. 5) The memo made clear that the reorganization involved no promotions or demotions.  The memo set out other staffing and duty changes not affecting Ms. Thompson.  The organization of the AOC was changed so that only legal counsel, internal audit, and guardian ad litem would report directly to Mr. Becker.  All other activities were organized into five divisions, including court services, which was directed by Ms. Allard.  These changes necessitated changes other than those affecting Ms. Thompson, including the transfer of Barbara Hanson, director of human resources, from reporting directly to Mr. Becker to being supervised by the director of the management services division.

6

Initiation of Internal Audit of Ms. Thompson

In the November 19 letter, Mr. Becker had informed Ms. Thompson that Ms. Allard would prepare a corrective action plan to address the ongoing performance problems.  Shortly after sending the letter, Mr. Becker and Ms. Allard met to discuss the letter and the corrective action plan.  When Ms. Allard asked Mr. Becker about specific allegations in the letter, he told Ms. Allard that he did not want to discuss the details of the problems he had with Ms. Thompson.  Instead, he wanted Ms. Allard to begin on a blank slate in her supervision of Ms. Thompson.

Even before the corrective action plan was completed, Ms. Allard supervised Ms. Thompson's work and schedule more closely than Mr. Becker had, including requiring doctor's notes for time spent out of the office and reviewing documents Ms. Thompson wished to send out to judges.[5]  In the course of reviewing Ms. Thompson's work, Ms. Allard became concerned about some of Ms. Thompson's procurement practices and reported those concerns to Mr. Becker.  In particular, Ms. Carpenter, Ms. Thompson's assistant, had told Ms. Allard that Ms. Thompson's sister had been hired to work on a grant that Ms. Thompson administered.

In response to Ms. Allard's concerns, at the end of December 2002,  Mr. Becker asked that the AOC's internal auditor, Heather McKenzie-Campbell, perform an audit of Ms. Thompson's purchasing practices.  Ms. McKenzie-Campbell testified that when asked to do the audit, Mr. Becker told her the audit was requested for two reasons.  First, Ms. Allard was having

---

[5]The information Ms. Thompson sent out to judges was a major source of tension between Ms. Thompson and Mr. Becker.  She believed he was unreasonably curtailing her ability to communicate with and provide information to the judges.

difficulty understanding some aspects of the Education for Justice grant.  Second, Ms. Allard had

learned that Ms. Thompson's sister was a consultant on the grant and had concerns about

nepotism.

Corrective Action Plan

On January 7, 2003, Ms. Allard completed the corrective action plan. Under the plan,

Ms. Thompson was to provide an accounting of her location during the workday because of the

problems with her unavailability and failure to account for her time.  The corrective action plan

also addressed Ms. Thompson's divisive behavior, including attempts to discredit the AOC by

"passing on [her] personal, often negative interpretation of activities and/or events to others."

(Def.'s Mem. in Supp. of Summ. J., Ex. 9) Ms. Allard explained in the plan that:

> As an individual, you are free to personally question the actions of court
> administrators, individual judges and those with whom you directly work. . . .
> However, as a court employee, particularly a public relations staff member whose job
> it is to communicate the positive side of the services offered by the courts, you are
> not entitled to actively spread rumors or distribute information and/or "propaganda"
> in which you attempt to highlight inefficiencies, deficiencies, and/or questionable
> practices of the courts and/or the AOC.  The only entity with which you are
> authorized to communicate these negative impressions as part of your work is the
> State or AOC Auditor's Office.

Id.  Ms. Thompson testified that she was aware that the state auditor's office is separate from the

legislative auditor.  Ms. Allard testified that when she wrote "State Auditor's Office" she

believed she was including the legislative auditor.

Audit Results

During the course of the audit, Ms. McKenzie-Campbell gave two updates to AOC

management: She gave the first to Ms. Allard, Mr. Johnson, and Ms. Hanson; she gave the

second to Ms. Allard, Mr. Johnson, Mr. Becker, and Mr. March.  On March 6, 2003, Ms.

McKenzie-Campbell submitted the final audit report.  In the executive summary of the audit report, Ms. McKenzie-Campbell wrote that her audit of Ms. Thompson "indicates a pattern of violations of Utah State Personnel Policies and Procedures" involving nepotism, abuse of position and conflict of interest.  (Def. Mem. Supp. Summ. J., Ex. 12 at 3) In addition, Ms. McKenzie-Campbell found that Ms. Thompson "did not comply with Utah State Purchasing Policies and Procedures, even after the AOC Purchasing Agent provided [her] directives before she made procurement decisions."  (Id.)

In the audit report, Ms. McKenzie-Campbell  identified a pattern of hiring people with whom Ms. Thompson had a personal relationship without following the proper bidding procedures.  Ms. McKenzie-Campbell reported that Ms. Thompson had hired her sister, Charlene Koplin, to perform work as a consultant on the "Education for Justice" grant. Ms. McKenzie-Campbell listed other problems with the hiring of Ms. Koplin:  Ms. Thompson had not gotten competing bids or obtained "sole source provider" status despite receiving specific instructions to do so by the AOC purchasing agent; Ms. Thompson had not properly disclosed the relationship to AOC management; Ms. Thompson had prepared Ms. Koplin's invoice, a violation of  state policy; and finally, although the grant application claimed Ms. Koplin had been recommended by "the Granite School District leaders," Ms. McKenzie-Campbell was unable to locate anyone at the Granite School District who had made such a recommendation.

Another troubling disclosure in the audit report was that Ms. Thompson had hired Mindy Jamison to perform graphic design work.  Ms. Jamison and Ms. Thompson had  purchased a home together.  Moreover, Ms. McKenzie-Campbell had found a document on Ms. Thompson's computer indicating that Ms. Jamison owed Ms. Thompson money at the time the work on grants

awarded by Ms. Thompson was performed.  The document lists debts owed to Ms. Thompson

from Ms. Jamison stemming from a 2001 loan and the purchase of an oven.  Payments made on

the loan are shown on the document, including a March 2002 payment of $250.00 with the

notation "Olympic Graphic Art" and payments of $200.00 and $250.00 in the spring of 2002

with the notation "Graphic art design courts."  (Def. Mem. Supp. Summ. J., Ex. 12 at 19; Def.

Reply Supp. Summ. J., Ex. 5) "Olympic Graphic Art" and "Graphic art design courts" appear to

refer to payments made to Ms. Jamison on contracts awarded by Ms. Thompson for graphic

design work related to the Olympics.  Nine hundred and twenty-five dollars was shown under the

heading "total paid."  The document included a note from Ms. Thompson to Ms. Jamison.  In the

note Ms. Thompson asked Ms. Jamison to repay the money she owed to her.  Ms. Thompson

wrote, "I've tried to help you out with payments for your graphic art design."  (Id.)  Ms.

McKenzie-Campbell concluded that the document demonstrated that Ms. Thompson awarded

Ms. Jamison contracts so that Ms. Jamison could repay debts owed to Ms. Thompson.

The audit raised additional concerns regarding the award of a grant to photographer Erin

Woodruff.   Based on reports from Ms. Thompson's former assistant and emails between Ms.

Thompson and Ms. Woodruff, Ms. McKenzie-Campbell believed that Ms. Woodruff and Ms.

Thompson were personal friends.[6]  And although Ms. Woodruff had traveled to Utah to take the

photographs from August 1 through August 4, 2001, a quote bid sheet for the project was not

prepared until September 26, 2001.  In a July 6, 2001 email to Ms. Woodruff, Ms. Thompson

wrote "I'll need to get a bid on paper from you, but YOU got the job."  (Def. Mem. Supp. Summ.

---

[6]In the emails Ms. Thompson and Ms. Woodruff make plans for Ms. Woodruff to stay
with Ms. Thompson while she is in Utah and it is clear that the two had previously met.

J., Ex. 12 at 23) The audit concluded that Ms. Thompson had granted Ms. Woodruff the contract without going through the proper bidding process and later, after the work was finished, prepared a bid sheet to give the appearance that procurement procedures had been followed.

The audit also uncovered consistent and persistent problems in documenting bids, properly obtaining invoices, and otherwise failing to keep proper records for money spent. These problems arose in the projects involving Ms. Koplin, Ms. Jamison and Ms. Woodruff, as well as in several other areas. The audit reported that Janice Ashby, AOC purchasing agent, had stated that she had an ongoing problem with Ms. Thompson. According to Ms. Ashby, she had gone over the purchasing policies with Ms. Thompson, but there were still frequent problems with Ms. Thompson's procurement practices. In addition, in 1998, Ms. Thompson had failed to follow proper bidding procedures for a video she commissioned. As a result of that incident, Ms. Thompson had written a letter indicating she understood the procurement guidelines and pledged to adhere to them in the future.

Ms. Thompson claims that the audit report had errors that demonstrate the report was rushed to provide a justification for her termination. In particular, she charges that had Ms. McKenzie-Campbell interviewed her and asked her about these events, she would have been able to easily explain them. For example, she maintains that Chief Justice Durham and Mr. Becker were informed about Ms. Koplin's identity. Ms. Thompson points to a note she wrote to the Chief Justice Durham on October 21, 2002, telling her that Ms. Koplin was her sister and that the conflict had been disclosed to the proper parties. She states, without support, that "it is only logical" that Chief Justice Durham would have told this to Mr. Becker. (Thompson Aff. ¶ 48.1)

11

She also argues that Mr. Becker had met Ms. Koplin and knew she was Ms. Thompson's sister.[7]

Ms. Thompson's claims do not contradict the primary finding of the audit report concerning her hiring of Ms. Koplin, that is, that Ms. Thompson did not follow proper procedures in disclosing the conflict before she awarded the grant.  It is undisputed that the grant was submitted in August of 2002 and that Ms. Koplin began work in September of 2002, well before Ms. Thompson informed Chief Justice Durham of the conflict.  And there is no evidence that the Chief Justice ever mentioned the note to Mr. Becker.  As Chief Justice Durham testified, the note from Ms. Thompson indicated that all potential conflict issues had been resolved and were no longer an issue.  Furthermore, Mr. Becker testified that following his usual practice for grants of this size, he had read only the budget page and program description of the grant and would not have been aware of the personnel working on the grant.   The most favorable reading of these events for Ms. Thompson is that had Mr. Becker read the personnel section of the grant, he might have realized that Ms. Thompson's sister was a consultant on the grant.  But Ms.

_____

[7]In her affidavit Ms. Thompson testified,

> I had put a great deal of work into a binder of information about the Education for Justice project to accompany my grant application.  When I gave it to Becker, I explained that a portion of the project was to continue the word [sic] initiated by Judge Thorne at the Lincoln Elementary assembly.  I mentioned that my sister Char would be developing a curriculum for minority student to better understand the courts.  I reminded him that he had met her recently at the assembly.  He didn't ask me any questions and indicated he would review it when he could but he had a busy schedule.

(Thompson Aff. ¶ 48.m) This paragraph is ambiguous.  Ms. Thompson does not say whether she informed Mr. Becker that Ms. Koplin would be developing curriculum as a part of the grant.  Neither is the timing of this conversation clear.  From this statement the court can only conclude that Ms. Thompson had a general conversation regarding her sister's work with Mr. Becker, but did not tell him that work would be performed under the Education for Justice Grant.

Thompson submits no evidence that Mr. Becker ever read the section and therefore, there is no evidence that he had actual knowledge of Ms. Koplin's involvement.

Ms. Thompson also denies having a personal relationship with Ms. Woodruff.  And, according to her, the bid sheet was created after the project was completed because, although she had obtained verbal bids before the project, she had neglected to document those bids.

Ms. Thompson claims that she has never financially benefitted from any of the work awarded to Ms. Jamison.  She testified that Ms. Jamison "has never been financially in debt to me."  (Thompson Aff. ¶ 54) In her deposition, Ms. Thompson maintained that the document was never sent to Ms. Jamison and that amount the document listed as a "loan" to Ms. Jamison was actually a gift.  She admitted, though, that Ms. Jamison was making payments to her toward the purchase of an oven in the amount of $925.  (Def. Mem. Supp. Summ. J., Ex. 2 at 46-48)

<u>Termination</u>

A meeting was held to discuss the audit results.  Present at the meeting were Mr. Becker, his deputy Myron March, AOC counsel Brent Johnson, Ms. Allard, Ms. McKenzie-Campbell, and Ms. Hanson.  Ms. Allard testified that Mr. Becker was "hands off" at the meeting and never asked if those present thought Ms. Thompson should be terminated.  (Def. Mem. Supp. Summ. J., Ex. 6 at 82) The others at the meeting agreed that the results of the audit justified Ms. Thompson's termination.  Mr. Becker testified that Mr. Johnson, Ms. Hansen and Ms. McKenzie-Campbell made a recommendation to him that Ms. Thompson be terminated and that he agreed with their recommendation.  Ms. Thompson was terminated by a letter that explained the charges against her.  She was not given an opportunity to respond to the charges before her termination.

13

After Ms. Thompson's termination, Mr. Becker gave the audit report to the judicial council and Mr. Johnson disclosed it to the legislative auditors. Mr. Becker testified that he and Mr. Johnson discussed giving the audit to the legislative auditors and decided it was relevant because they were concerned the legislative auditors would believe Ms. Thompson had been fired in retaliation for her cooperation with them.

Name Clearing Hearing

In a letter dated March 12, 2003, Ms. Hanson informed Ms. Thompson that she was entitled to refute the allegations against her. The letter stated she could submit a written response to the allegations contained in the termination letter. That response would be reviewed by the management committee of the judicial council. But that review could not result in her reinstatement. According to Ms. Thompson, she declined to submit a response because she knew the hearing could not result in her reinstatement and she believed that those conducting the review would be biased against her. She never requested any other type of name clearing hearing from the AOC. But Ms. Thompson did write a letter to the Justices of the Utah Supreme Court presenting her version of events and requesting that they intervene in her case. The Justices replied that, although her allegations were concerning, it was inappropriate for them to intervene in a personnel matter.

Shoplifting Charge

During her audit investigation, Ms. McKenzie-Campbell discovered documents on Ms. Thompson's computer relating to a plea that Ms. Thompson had entered in a criminal case for shoplifting in 2002. She reported this to Mr. Johnson and Mr. Becker. Mr. Johnson obtained a copy of Ms. Thompson's criminal file. The file showed that Ms. Thompson had entered a plea in

abeyance, which was completed in August 2002.  Information in the file also raised concerns that Ms. Thompson had received community service credit for work she did not do.  As part of her community service, Ms. Thompson agreed to update a link on the AOC's website.  The updating of this link was actually done by Ms. Allard.  Ms. Thompson maintains her commitment was to ensure that the link was updated, not to actually do the update herself.  It is undisputed that Ms. Allard was unaware of the community service requirement when she did the work to update the link.

Ms. McKenzie-Campbell was instructed to continue investigating this issue after Ms. Thompson was terminated.  She concluded that Ms. Thompson may have represented the work Ms. Allard did as hours toward the completion of her community service requirement.  During this period, the trial court handling Ms. Thompson's shoplifting case issued an expungement order.  It is undisputed that Ms. Thompson never served this order on the AOC.

Mr. Becker and Mr. Johnson determined that they needed to notify the prosecutor in Ms. Thompson's case of their findings.  A hearing was scheduled on the matter and both Ms. McKenzie-Campbell and Ms. Allard were subpoenaed to testify.  The court found that the conviction was expunged and the case could not be reopened.

Despite the expungement order, Ms. Thompson's record remained accessible through the state court's system for approximately three years.  In her affidavit, Ms. Allard testified that this was due to a clerical error.  Rather than expunging the record, the name on the case file was changed to "case expunged."

Legislative Audit Results

In May of 2004, the legislative auditor released its report.  In a section titled "Allegations

15

Were Reviewed But Not Substantiated," the report discusses the allegations brought by Ms. Thompson to the legislative auditor.  The section begins by noting that before the onsite audit began, a registered whistle blower (Ms. Thompson) who had been communicating with audit staff was terminated.  This concerned the legislative audit staff and they approached the onsite audit with the goal of ensuring employees of the AOC were not being retaliated against for cooperating with the audit.  Accordingly, the legislative audit staff began by interviewing all AOC employees so that no employee could be singled out.  They found that complaints about management were not widespread.  In addition, legislative audit staff investigated all of the specific allegations made by Ms. Thompson.  Their report concluded that those allegations could not be substantiated.

STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Justice v. Crown Cork & Seal Co., Inc., 527 F.3d 1080, 1085 (10th Cir. 2008).  The court must construe all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Seegmiller v. LaVerkin City, 528 F.3d 762, 766 (10th Cir. 2008).  "A mere scintilla of evidence in support of the nonmoving party's position, however, is insufficient to create a genuine issue of material fact."  Grace United Methodist Church v. City of Cheyenne, 451 F.3d 643, 649 (10th Cir. 2006).

ANALYSIS

Ms. Thompson alleges violations of her constitutional rights by Mr. Becker in his official

16

and individual capacities under 42 U.S.C. § 1983.  Ms. Thompson claimed Mr. Becker violated

her First Amendment right to free speech, her Fourteenth Amendment liberty interest in her

reputation and her employment, and her Fourteenth Amendment property interest in the

expungement of her criminal record.  The complaint also alleged violations of state common law

and Utah statutes against the AOC and Mr. Becker.

1.  <u>Eleventh Amendment Immunity</u>

     Mr. Becker argues he is entitled to immunity under the Eleventh Amendment for the

federal claims made against him under § 1983 in his official capacity.  The Supreme Court has

held that "absent waiver by the State or valid congressional override, the Eleventh Amendment

bars a damages action against a State in federal court.  This bar remains in effect when State

officials are sued for damages in their official capacity."  <u>Kentucky v. Graham</u>, 473 U.S. 159,

169 (1985) (citations omitted).  Accordingly, Ms. Thompson's damages claims against Mr.

Becker in his official capacity are barred by the Eleventh Amendment.  <u>Meiners v. University of

Kansas</u>, 359 F.3d 1222, 1232 (10th Cir. 2004).

     Ms. Thompson claims that she is also requesting injunctive relief in the form of

reinstatement as Communications Director, payment of back wages, and full reinstatement of

benefits and seniority rights.  Prospective injunctive relief is not barred by the Eleventh

Amendment.  <u>Ex Parte Young</u>, 209 U.S. 123 (1908).  To determine if the <u>Ex Parte Young</u>

doctrine is applicable, this court makes a four-part inquiry:

> First, we determine whether the action is against state officials or the state itself.
> Second, we look at whether the alleged conduct of the state officials constitutes a
> violation of federal law.  Third, we assess whether the relief sought is permissible
> prospective relief or analogous to a retroactive award of damages impacting the
> state treasury.  Finally, we analyze whether the suit rises to the level of

17

implicating 'special sovereignty interests.'

Robinson v. Kansas, 295 F.3d 1183, 1191 (10th Cir.2002) (citations and quotations omitted).

Here, Ms. Thompson's request for back wages are analogous to a damages award and are also

barred.  Meiners v. University of Kansas, 359 F.3d 1222, 1232-33 (10th Cir. 2004).  But her

request for reinstatement is prospective injunctive relief and not barred by the Eleventh

Amendment.[8]

2.      First Amendment Retaliation Claim

        Ms. Thompson contends that Mr. Becker took adverse employment actions against her in

retaliation for exercising her right to free speech when she spoke to the legislative auditor.  She

argues that those adverse employment actions include her reassignment and the corrective action

plan, which she characterizes as a demotion, and her subsequent termination.

        The test for determining whether Ms. Thompson was denied her constitutional right has

five prongs:

> (1) whether the speech was made pursuant to an employee's official duties; (2)
> whether the speech was on a matter of public concern; (3) whether the
> government's interests, as employer, in promoting the efficiency of the public
> service are sufficient to outweigh the plaintiff's free speech interests; (4) whether
> the protected speech was a motivating factor in the adverse employment action;

---

[8]The Defendants also seeks dismissal of the § 1983 claims against Mr. Becker in his
official capacity because he is not a "person" under § 1983.  "Neither the state, nor a
governmental entity that is an arm of the state for Eleventh Amendment purposes, nor a state
official who acts in his or her official capacity, is a 'person' within the meaning of § 1983."
Harris v. Champion, 51 F.3d 901, 905-06 (10th Cir. 1995).  But, "[o]f course a state official in
his or her official capacity, when sued for injunctive relief, would be a person under § 1983
because official-capacity actions for prospective relief are not treated as actions against the
State."  Will v. Mich. Dept. of State Police, 491 U.S. 58, 71 (1989).  Accordingly, as with
Eleventh Amendment immunity, to the extent Ms. Thompson is requesting prospective
injunctive relief her claim is not barred.

and (5) whether the defendant would have reached the same employment decision
in the absence of the protected conduct.

Dixon v. Kirkpatrick, 553 F.3d 1294, 1301-02 (10th Cir. 2009).  The first three prongs are issues

of law and the last two are factual issues, normally decided by the finder of fact.  Id. at 1302.  An

employee bears the burden of  establishing the first four factors but employer has the burden to

establish the fifth.  Maestas v. Segura, 416 F.3d 1182, 1190 (10th Cir. 2005).

Mr. Becker does not contest the first three prongs of the test.   Instead, he strongly argues

that a reasonable jury could not find that Ms. Thompson's protected speech was a motivating

factor in the adverse employment actions or that Mr. Becker would not have reached the same

employment decision in the absence of her protected conduct.[9]  Because the fourth and fifth

prongs present questions of fact, Mr. Becker's argument can be successful only if no reasonable

jury could conclude otherwise.  See Maestas, 416 F.3d at 1190.

November Reorganization/Demotion

First, under the fourth factor,[10] the employee bears the burden of establishing an adverse

employment action.  Id. at 1188 n.5.  Ms. Thompson's termination is certainly an adverse

employment action.  But the question remains whether the November 2002 restructuring and the

corrective action plan, which Ms. Thompson maintains was a demotion, constitute an adverse

_____

[9]The parties have applied the four prong test set out in Pickering v. Bd. of Educ., 391 U.S.
563, 568 (1968).  After the Supreme Court's decision in Garcetti v. Ceballos, 547 U.S. 410
(2006), the proper inquiry must include an examination of whether the speech was made pursuant
to an employee's official duties.  State employees are not entitled to First Amendment protection
for speech made pursuant to their official duties.  Thomas v. City of Blanchard, 548 F.3d 1317,
1323 (10th Cir. 2008).  Here, it appears Ms. Thompson's speech was outside the bounds of her
regular duties and accordingly is protected by the First Amendment.  See id. at 1323-24.

[10]Cases decided prior to Garcetti, 547 U.S. at 410, refer to the "motivating factor" prong
as step three.

action.  The Tenth Circuit has stated "that some forms of retaliation may be actionable under the First Amendment while insufficient to support a discrimination claim under Title VII."  Id.  But it has never held that any "employment action which may tend to chill free speech is necessarily adverse."  Id.  Accordingly, in this circuit, the law is not clear about what qualifies as an adverse action.  So the court will assume, for purposes of this motion only,  that the reassignment of Ms. Thompson's duties and the procedures outlines in the corrective action plan were adverse actions With this in mind, the court must decide whether Ms. Thompson has met her burden of showing that her communications were a motivating factor in the adverse employment actions and if they were, whether the AOC would have terminated her employment anyway.

To withstand summary judgment at step four, "an employee must produce evidence linking the employer's action to the employee's speech."  Maestas, 416 F.3d at 1188.  This evidence must be more than speculation or a showing that the defendants may have welcomed the elimination of the protected speech.  Id. at 1189.  An adverse action taken in close proximity to protected speech can support an inference of retaliatory motive.  But, such proximity in and of itself is insufficient to establish that the protected speech was a substantial motivating factor.  Id.; Baca v. Sklar, 398 F.3d 1210, 1221 (10th Cir. 2005).  Factors that support an employee's claim of retaliation include "an employer's knowledge of the protected speech, together with close temporal proximity between the speech and challenged action," the employer's "expressed opposition to the employee's speech," and "evidence the speech implicated the employer in serious misconduct or wrongdoing."  Id.

Ms. Thompson has presented sufficient evidence to meet her burden for prong four in connection with the corrective plan and reassignment.  She has shown that Mr. Becker knew

about her protected speech and was concerned enough to call the legislative auditor.  The

reassignment was within weeks of these events.  Mr. Becker expressed opposition to her speech

by rebuking her in the meeting with Chief Justice Durham.  Although she has not shown that her

speech implicated Mr. Becker in serious wrongdoing,[11] the timing of the action and Mr. Becker's

actions in phoning the auditor and reprimanding Ms. Thompson are sufficient under this prong.

But Defendants have provided evidence showing that the adverse actions would have

occurred even absent the protected speech.  See Baca, 398 F.3d at 1221.  First, as discussed

above, the Defendants have presented evidence that the events in November of 2002 were part of

a broader restructuring and that some kind of reorganization was necessary for the AOC at that

time.  This evidence is undisputed.

Furthermore, the changes that Ms. Thompson contends were retaliatory, were rationally

related to addressing previously identified problems with her performance.  In July of 2002,

several months before Ms. Thompson spoke to the auditors, she received a performance

evaluation.  That performance evaluation identified numerous areas in which Ms. Thompson's

performance was deficient.  The evidence leaves no doubt that Ms. Thompson did not like

working for Mr. Becker and that Mr. Becker was aware of that.[12]  Ms. Thompson's reassignment

and the corrective action plan are directly related to these issues.  In his letter to Ms. Thompson,

Mr. Becker explained that she was being transferred to Ms. Allard's supervision in part because

---

[11]In fact, the legislative auditors report indicates that her claims of misconduct were
unfounded.

[12]Ms. Thompson's criticisms of Mr. Becker and AOC management to her colleagues and
to judges is not protected speech under the First Amendment.  Brammer-Hoelter v. Twin Peaks
Charter Academy, 492 F.3d 1192, 1204 (10th Cir. 2007).

she has expressed she did not like working for him.  The evidence shows Ms. Thompson's work duties were decreased because she had problems completing all of her tasks.  The duties Ms. Thompson prioritized and was successful with (working with judges) remained with her.

Likewise, the corrective action plan, written by Ms. Allard, was designed to correct problems identified in the July 2002 performance evaluation that had not improved.  Specifically, the corrective action plan sought to remedy the problems with Ms. Thompson's availability and continued spreading of rumors in the office.  Under these circumstances, a reasonable jury could not conclude that the reorganization and corrective action plan would not have occurred absent Ms. Thompson's protected speech.

Termination

Ms. Thompson's ultimate termination is a separate adverse employment action.  For this action, Ms. Thompson has not met her burden for prong four.  The undisputed facts in the record show that it was Ms. Allard who first raised concerns about Ms. Thompson's grant administration.  Although Ms. Allard was aware of Ms. Thompson's cooperation with the legislative auditors, there is no evidence to suggest that Ms. Allard was motivated to retaliate against her.  Ms. Thompson's speech to the auditors did not include allegations against Ms. Allard.  Ms. Allard testified that after Ms. Thompson came under her supervision, Mr. Becker wanted them to have a blank slate and therefore did not discuss his conflicts with Ms. Thompson.

The audit was conducted solely by Ms. McKenzie-Campbell.  There is no evidence in the record to support the claim that Ms. McKenzie-Campbell was motivated to retaliate against Ms. Thompson.  Ms. Thompson makes the conclusory assertion that the audit report had many errors that demonstrate the report was rushed to provide a justification for her termination.  Because the

22

audit process was rushed, she argues, "the auditor was unable to do a fair and unbiased job."

(Plt.'s Opp. Summ. J. at xv)  But the record does not support this claim.  First, there is no

testimony indicating that Ms. McKenzie-Campbell was told to rush the audit.  Neither is there

any evidence that Mr. Becker directed the audit or otherwise interfered with Ms. McKenzie-

Campbell's autonomy in its preparation.

   Moreover, the audit's findings do not demonstrate a lack of thoroughness or the presence

of bias.  Although Ms. Thompson provides her own explanations for the audit's findings, none of

her proffered explanations demonstrate the audit was fundamentally flawed.  Most compellingly,

there is no evidence that Ms. McKenzie-Campbell knew or had reason to know of Ms.

Thompson's excuses.  For example, Ms. Thompson claims the invoice on her computer for debts

owed and payments made by Ms. Jamison was not fully accurate nor ever sent.[13]  But the plain

language of the document clearly suggests that Ms. Jamison owed Ms. Thompson money and

used funds paid to her by the courts to repay Ms. Thompson.  Similarly, although Ms. Thompson

denies having a personal relationship with Ms. Woodruff, the emails Ms. McKenzie-Campbell

reported indicate otherwise.[14]

   Ms. McKenzie-Campbell's interpretation of these documents was reasonable and

supported.  And absent evidence that she knew of Ms. Thompson's explanations, Ms. McKenzie-

Campbell had no obligation to seek Ms. Thompson's version of events.  The First Amendment

---

[13]Ms. Thompson's explanation in her affidavit, that Ms. Jamison never owed her money, is at odds with her deposition testimony that Ms. Jamison was in fact making payments to her for the purchase of an oven.

[14]Ms. Thompson supplied two explanations of her relationship with Ms. Woodruff to the court.  In her affidavit and her deposition she claims to have met her on a business trip.  In her memorandum, Ms. Thompson claims Ms. Woodruff is someone she had never met.

provides only a substantive right to public employees, not a procedural right.  Accordingly, a

government employer's adverse action against an employee need not be correct or fair.  The First

Amendment only requires that it not be in retaliation for protected speech.  <u>Connick v. Myers</u>,

461 U.S. 138, 146 (1983).  There is no evidence that Ms. McKenzie-Campbell prepared the audit

with any retaliatory motivation.

Finally, the meeting which culminated in the decision to terminate Ms. Thompson's

employment demonstrates that Ms. Thompson has not carried her burden for prong four.  At the

meeting, absent input from Mr. Becker, those present agreed that based on the information in the

audit report, Ms. Thompson's employment would be terminated.  Mr. Becker agreed with this

assessment and carried out the termination.  Accordingly, a reasonable jury could not find that

"the protected speech played a substantial part in the employer's decision" to terminate Ms.

Thompson's employment.  <u>Maestas</u>, 416 F.3d at 1188.

    3.    <u>Fourteenth Amendment Liberty Interest</u>

Ms. Thompson also claims that Mr. Becker violated 42 U.S.C. § 1983 for infringing on

her Fourteenth Amendment liberty interest in her reputation.  "The concept of liberty recognizes

two particular interests of a public employee: 1) the protection of his good name, reputation,

honor, and integrity, and 2) his freedom to take advantage of other employment opportunities."

<u>Conaway v. Smith</u>, 853 F.2d 789, 794 (10th Cir. 1988) (quotation omitted).

It is undisputed that Ms. Thompson was offered a name clearing opportunity and never

responded to the offer.  The Fourteenth Amendment provides only a procedural protection

against injury to reputation.  <u>Quinn v. Shirey</u>, 293 F.3d 315, 321 (6th Cir. 2002).  This procedural

right can be waived if a plaintiff fails to take advantage of the procedural rights she was

afforded.[15] Pitts v. Bd. of Educ. of U.S.D. 305, Salina, Kansas, 869 F.2d 555, 557 (10th Cir. 1989); see also Ballmer v. Bd. of County Comm'rs of Sedgwick County, 1991 WL 50161, *8 (10th Cir. 1991) (unpublished).  The AOC offered Ms. Thompson the opportunity to receive a hearing and repudiate the charges against her.  Accordingly, she denied the AOC and Mr. Becker the opportunity to afford her procedural due process and cannot now assert her rights were denied.  Mr. Becker is entitled to qualified immunity for this claim.

4.  Fourteenth Amendment Property Interest

      Ms. Thompson asserts that she had a property interest in the expungement of her criminal record.  She points to the Utah Code which mandates that "[n]o state, county, or local entity, agency, or official may, after receiving service of an expungement order, divulge information contained in the expunged portion of the record."  Utah Code § 77-18-14(5).  The procedural component of the Due Process Clause affords protection from the deprivation of property by a State without due process of law.  A property right can be created through entitlements in state law.  But the protection does not extend to "everything that might be described as a benefit: To have a property interest in a benefit, a person clearly must have more than an abstract need or desire and more than a unilateral expectation of it."  Town of Castle Rock v. Gonzales, 545 U.S. 748, 755-56 (2005) (quotations omitted).  In particular, "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion."  Id. at 756.

---

[15]Although the Tenth Circuit has not yet adopted such a requirement, several circuits have held that to show that a liberty interest in an individual's reputation has been infringed, an employee must show that she has requested and been denied a name-clearing hearing.  See e.g. Bledsoe v. City of Horn Lake,  449 F.3d 650, 653 (5th Cir. 2006); Quinn v. Shirey, 293 F.3d 315, 321 (6th Cir. 2002).

Ms. Thompson did not serve the expungement order on the AOC or Mr. Becker. She claims that because the expungement order was generated by a court clerk, the AOC had notice and was bound by the statute. The statute, however, is quite specific. It states, "[t]he petitioner shall be responsible for service of the order of expungement to all affected state, county, and local entities, agencies, and officials including the court, arresting agency, booking agency, Department of Corrections, and the division." Utah Code § 77-18-14(2). There is no obligation on a state entity to investigate or otherwise have in place reasonable procedures to ensure that expungement orders that it has access to complied with. Any obligation on the part of a state entity attaches only after the petitioner serves the expungement order on the agency. See Utah Code § 77-18-14(5). Because Ms. Thompson failed to do so, the AOC and Mr. Becker had no obligation under state law to keep her record confidential.

5. <u>State Law Claims</u>

Because the federal constitutional claims have been disposed of, the court will not exercise its supplemental jurisdiction over the Plaintiff's remaining state claims. 28 U.S.C. § 1367(c)(3).

## ORDER

For the foregoing reasons, the Defendants' motion for summary judgment is GRANTED.

DATED this 8th day of April, 2009.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief Judge

26